So we'll go ahead and start with 19-3265 U.S. v. Williams. Ms. Reynolds, you may proceed. Good morning, your honors. The issue before this court is did officers have a reasonable suspicion to believe that Justin McCoy, a murder suspect in a homicide, was in Mr. Williams' vehicle? Did officers have reasonable suspicion that would justify the level of force used in this case, indistinguishable from an arrest that was employed here? If they did not, the detention and search of Mr. Williams violates the Fourth Amendment's protections. A traffic stop must be limited in both scope and duration. The Topeka Police Department acknowledged that they didn't have reasonable suspicion or probable cause to stop Mr. Williams, so they waited for him to give it to them, which he did by failing to signal 100 feet in advance. That is a traffic offense, and it entitled officers to do the things that officers do when stopping for a traffic offense. Checking identification, checking for warrants, issuing a citation or a warning. But none of that happened here. Though the officers stopped Mr. Williams for a traffic offense, they abandoned that pretense at the moment that he pulled over. They did not run his name, they never issued a citation, and they never investigated the reasons for the stop. These acts are indistinguishable from an arrest triggering the Fourth Amendment's probable cause requirement. But of course, not all felony stops bump a traffic stop to an arrest. Ms. Frum, let me stop you for a second. Just to be clear from the record, I know there were at least two officers present at the stop. Were there more? I mean, I could see the two on the video. Were there more present? I just want to get a sense of, you know, for some cases it matters whether the officers outnumber the defendant and by how much. Do you have a sense of that? Yes, thank you, Your Honor. There were at least five officers on the scene with weapons drawn. A number of cars were also on the scene. Wait a second. I thought what Judge Holmes was asking about was initially. Initially it was two officers. Yes, that's what I was asking about. Initially, yes. The first car that pulled Mr. Williams over was Officer Qualls and Nelson riding together. There were other officers in the area that came within minutes that cleared the vehicle also. But the clarification for me is yes. What I wanted to know is at the time of what one would deem to be the felony stop, how many people were there? And so I understand that to be this. Indeed, Your Honor, that is correct. And when you say their guns were drawn, do you mean they were out of their holster? Were they pointing their? At what point, if any, did they point their weapons at Mr. Williams and his passenger? The testimony at the hearing reflects that they were drawn in the low ready position. What's that mean? According to the officers means pointed down and not at anyone in particular, but in what is called the low ready position. Ready if necessary, Your Honor. Were their firearms ever pointed at Mr. Williams and his passenger? By anybody? I don't believe that is not in the record. Okay. The officers in this case used techniques that we would associate with an arrest. That is guns and handcuffs. And that is reasonable if the officers believed those techniques were justified for their protection. The government relies on this exception to justify these tactics in this case. But to justify that exception, they must have a reasonable belief that they were necessary. The government does not claim that they had any information that Mr. Williams was dangerous. The government does not claim that they had information that he was armed. Indeed, that he had a criminal history. There is no information in the record to support any inference that Mr. Williams was armed or dangerous. What about Mr. McCoy? The government relies on this derivative dangerous for Mr. McCoy. And it's possible that that would be reasonable if there was reason to believe Mr. McCoy was in the vehicle. And it is Mr. Williams' position that that belief is unreasonable based on the record. They had never been seen together. Not on April 10th, 37 days prior. Mr. McCoy had never been seen in Mr. Williams' vehicle despite Mr. McCoy being under surveillance for at least a month. Since late March or early April, according to the record. They had never seen Mr. McCoy and Mr. Williams together at any location. Not the address that is associated to Mr. McCoy in this instance or any other address. On the night in question, Mr. McCoy's girlfriend's residence was under surveillance. They never saw Mr. McCoy at all in the Paradise Plaza complex. They never saw anyone, Mr. McCoy or otherwise, get into Mr. Williams' vehicle. They had never seen them together. So the inference goes something like this. Mr. McCoy is associated with a number of locations in Topeka. Mr. Williams went to one of those locations and then a second location. So the inference is Mr. McCoy knows people, apparently, that goes to those locations. That's as far as the inference can go. Mr. McCoy and Mr. Williams may know each other. I thought that the officers testified that Mr. McCoy was known to ride around in Mr. Williams' Denali. There is testimony from Officer Palumbo, which is the Topeka Police Department officer, who testifies that they received information from the task force, which includes Officer Salmon, who testified at the hearing. Officer Salmon doesn't testify to that information. He testified they were associated with each other and believing that people go into this residence, that they would have to be known associates and potentially working together. In Mr. Williams' view, to be seen at a house that is associated with another person is an unreasonable inference to suggest that they work together. That's the only time that he was at that location and he's seen going into the residence and exiting. He lived at that location, didn't he? Mr. McCoy? No, Williams and McCoy also lived there. Where the association that the government relies on is a house in Topeka that is associated with Mr. McCoy. Mr. McCoy did not live at that house, and that's in the record at Exhibit C in Volume No. 4, the affidavit for probable cause for Mr. McCoy's arrest. That house was owned by another, but the investigation by a number of agencies led them to believe that that was a home that was part of a criminal enterprise, including drugs and drug trafficking. You're talking about the Pennsylvania Avenue home? Indeed, Your Honor. Okay, let me ask you a couple questions, partly playing off of Judge Kelly's question. In your understanding, was the principal, either principal or sole, and I think it's the sole source of information that the officers had relative to this stop, the officers who executed the stop, the sole source of information they had came from the task force officer, Salmon. Is that correct? Yes. At the hearing, he is described as the principal investigator of this Mr. McCoy, not as Officer Salmon. He's a task force officer. He led a briefing earlier in the day on May 17th that was attended by Topeka Police Department officers. The purpose of that briefing, as we understand it from the record, was to locate McCoy and describe the efforts up to that point to locate Justin McCoy. What I'm trying to get at is would they have had independent information that they could have had that supported the execution of the stop, or were they relying solely on the information that was delivered to them by TFO Salmon? They are relying on that information, as well as another officer, Task Force Officer Knutson, who was at the task force briefing but did not testify at the suppression hearing. Officer Salmon did testify at the hearing. He is the source of the information to the officers. He's the one that radios from Paradise Plaza and says, quote, this is a good opportunity to check the vehicle and make sure McCoy is not inside. Well, I got that now. But if if let's assume we judge Kelly talking about a testimony that apparently was from Palumbo, let's assume that Palumbo misunderstood from the briefing whether McCoy was in a pattern of riding along with Williams. What is the legal consequence of the misunderstanding? In other words, let's say that you had TFO Salmon who never communicated that he had any knowledge of McCoy riding along with Williams. At this briefing, Palumbo hears what he thinks is some indication that McCoy rides along with Williams. What is the legal consequence of that misunderstanding for purposes of the stop? Purposes of the stop, your honor, I think the legal cost, the legal consequence of that is that it's an unreasonable basis for suspicion, because we don't have to wonder what officers salmon says that he said to the officers there. He says that he never had seen them together, that he had never seen Mr. McCoy in Mr. Williams vehicle. He's unequivocal about that. If Mr. Palumbo misunderstood, it's an unreasonable suspicion. And in any event, Mr. Palumbo is not the officer that conducted the stop. In this instance, it was Officer Qualls and Officer Nelson. Yes, but if the if the universe, but just to put a fine point on it. So if the universe of information that is available is information coming from salmon and within salmon's universe of information was no information of that. So we're going to judge the reasonableness of the stop based upon the information that he had. Right, Sam. Correct. OK, got it. Let me ask you this question. Footnote five of the district court's order suggested that this case was more akin to Purdue and Merritt than it was to any other case. I take it you disagree with that. And if so, you don't have to go in detail, but just give me what you think are the high differences between those cases in this one. Thank you, Your Honor. We do disagree in both of those instances, Purdue and Merritt. There was an eyewitness that associated the reasonable suspicion for the officers in those cases. Purdue, a search is ongoing at the time. In that case, there are weapons being found. It is a rural lane leading up to the house and officers have reason to believe there would be no reason to be there unless you were associated with the address. In Merritt, there's an eyewitness that puts a homicide suspect in a truck at that address where the seizure occurs. In our view, the reasonable suspicion in those cases is quite different than what is offered by the government in this case. Let me ask you, assuming that the detention was lawful, what do you have any arguments for suppression of the evidence if the detention was lawful? Yes, Your Honor. I see that my time is waning down. I'd like to reserve some time, but I'll try and answer this quickly. If the court determines that there was reasonable suspicion to use the tactics, the felony arrest tactics that were employed here, then plain view and plain smell cannot help the government either. Let me ask you about plain view. Okay. Because, at least from what I can see on the video from the body cam, you can't tell whether the officer who saw the jar with marijuana leaves had leaned into the car or not. He said he didn't cross the plane and the district court accepted that. Correct. Don't we have to accept that, then, that he did not cross the plane? I don't believe we do have to accept it, Your Honor. If the purported purpose… How is the judge clearly erroneous? You might have a different argument, but how is the judge clearly erroneous in finding that the officer had not crossed the plane at the door? Because by that point, Your Honor, we believe it's irrelevant because the search should have been complete. The investigative purpose, if it existed at all, was to locate McCoy. They had cleared the vehicle before Officer Palumbo even approached the front of the vehicle. So, by that point, they had no right to be in that area of the car. First, it's the front seat. Mr. Williams had exited. There's no reasonable belief that a suspect would be hiding in the front seat where Mr. Williams had just been exited. And for plain view to be applicable, the officer has to have a right to be in the area where he is. Mr. Palumbo had no right to be in the front compartment of the vehicle. He had no right to be on the street? Pardon? He had no right to be on the street? He has a right to be on the street, Your Honor. If he looks in the car and doesn't cross the plane, where is there a problem? The government, in this case, did not argue inevitable discovery, Your Honor. And in any event, our argument is under the seat isn't in plain view. And he could not have seen it had he not leaned in and under. I'd like to reserve the little remaining time for rebuttal. Thank you. Mr. Magg? Good morning, Your Honors, and may it please the court. My name is Jared Magg. I'm an assistant United States attorney for the District of Kansas. As you can tell from the record, I was also the prosecutor in the matter below. I do want to start off with a very short and simple apology. On page five of our brief, I did a poor editing job and noted that when I said it was a few days prior that the defendant was witnessed, that is actually incorrect. The few days prior was actually the murder. He was observed on April 10th, and I think it's fairly well understood through the record that that's the case. But I do apologize for a very poor editing on my part with respect to that statement. I just wanted to clear that up with the court. That was in the reply brief, so I don't think there was any harm at that point. But it shouldn't have been done, but nevertheless. Your Honors, I do think that this really does turn on very heavily on what the officers knew at the time, and so I do want to clarify some of the issues that I think and some of the factual concerns that the court might have with what the officers knew at the time. And let me focus on that. Is it your understanding that the information, the universe of information that the officers who executed the stop would have had came solely from the TFO Salmon? Who's the one who testified? But, I mean, would they have had any independent knowledge that would factor into the quantum of information for reasonable suspicion? Or should we say, let's look at what Officer Salmon said he knew and judge the reasonableness of the felony stop based upon what he knew alone? Judge Holmes, I think from the record, it's fair to say that the universe of information that the officers knew as they testified to came from the briefing that occurred just prior to or earlier in the day before the actual car stop occurred. Because there were certainly discussions amongst the task force officers and the individuals that they were looking for Justin McCoy. And some of the information we have based upon the briefing would have come from the testimony of Officer Salmon, right? That is correct. Okay. Now, here's what I will say. To the degree that the officers are very experienced officers and they knew, probably knew the names of the individuals, but I don't know that that's necessarily relevant. Under the circumstances, the universe of information came from the briefing which was testified to by Officer Salmon. However, I think the one key factor that really cannot be understated here is that the officers, Task Force Officer Salmon and Special Agent Knuheisen from the FBI were staked out at a location they believe Mr. McCoy was at because of Ms. Delgado. So, they are at that location. And out of nowhere, they see a car that they know is somehow associated with Mr. McCoy and they know that it's a car associated with Mr. Williams coming out of that location. It was coming out of an apartment complex where Mr. Williams lived. Isn't that right? It is. Have they seen McCoy at that apartment complex at any time? There was no testimony to that. They knew that Ms. Delgado lived there and that Mr. McCoy had an association with her. So, four days or five days now after the homicide, it was reasonable for them to assume that he might be at that location. So, that's why they were staking out that location. There was some confusion in the record and I wondered whether there was something there that would clarify as to whether they knew, the law enforcement writ large, knew that Mr. Williams lived at the apartment or the townhouse complex at the time of the day of the stop, May 17th. In the cross-examination of Officer Salmon, he suggested that he would have to check his notes or something to that effect. Do his notes, are his notes in the record or do his notes reveal whether they knew on May 17th that Williams lived at that apartment complex? No, Judge Holm, to be candid, that was never followed up on and never resolved. And I do admit that there is some discrepancy in the record as to whether or not they knew Mr. Williams lived in that apartment complex. And so, that is left unanswered. Nevertheless, to the degree that they see Mr. Williams' car leave, based upon their understanding of the investigation into the residence on Pennsylvania, they knew that Mr. Williams' association with Pennsylvania was significant. And as Judge Teeter notes on page 66 in the record, in her opinion, that as Officer Salmon explained, that because the houses were associated with trafficking, only persons known to or in association with the McCoys brothers would have been allowed to enter. So, when looking at the knowledge that the officers had about Mr. Williams going into that residence at Pennsylvania, led them to believe that he had a direct link to that residence and to the McCoys and that his link was significant enough that he could simply walk in. Do we even know that the McCoys were there when he was there? There's nothing in the record to suggest that. We knew that that was the residence associated to the McCoys. Well, associated, they didn't live there, right? No, they didn't. I think that that's where the confusion was necessarily about whether or not they actually owned the residence or whether or not they resided there from time to time. I think that's really where, whether or not that they're the actual owners on the deed of the house, I can't speak to that. I guess my point is this, and clarify where I'm wrong. Let's assume this is a drug and gun house, as there are many in these drug trafficking type operations. Okay, it's maintained for selling drugs. The defendant, Williams, a month before, 37 days before this event, goes in there to buy dope. Let's say he goes to the first address, Indiana, can't get what he wants or gets what he wants, and then goes to Pennsylvania to get some more dope. We have no way of knowing. All we know is that they knew he was a customer. We don't know that McCoy was in there. We don't know that McCoy knows him. Tell me when I'm wrong. We have never seen McCoy with him. We have nothing. All we know from that one incident a month prior, at the best scenario, is that he is a drug trafficker, drug user, drug consumer, and because he is, he can walk into that house. What do we know beyond that? From the record, that is what we know. Okay. What the officers knew with respect to their overall understanding of that long-term investigation, I think, cannot necessarily be discounted. Now, not all of that was brought out during the hearing. Well, I mean, if it's not in the record, it doesn't do us any good, does it? That's correct. I'm not saying that it doesn't, but to the degree that we can discount the amount of knowledge the officers have about that long-term investigation, what they knew about the McCoys, what they knew through all of the observation that they had on that house at the time, certainly confirmed their understanding that the McCoys ran their operation from that house. Let me back up a minute. We're focusing on all we need to. As I understand it, you conceded at the district court suppression hearing, and as far as I can tell, make no contrary argument on appeal, that if there was not reasonable suspicion to believe McCoy was in the vehicle, you lose. Am I correct about that? No, Judge, you're not. What my statement... What remaining arguments do you have that are consistent with what you said in district court? To be very clear, what I was telling the district court under those circumstances, that if the court did not believe that there was reasonable suspicion to actually effectuate the stop based upon the traffic violation, we lose everything from that point. I then moved to the next step. I said, Judge, if you believe that the traffic stop was fine, but you believe that the felony high-risk stop was unauthorized, then we lose everything from that point forward. That's what I meant. That's what I meant. And you, as far as I can tell, you agree that the high-risk traffic stop, the felony stop, was lawful only if there was reasonable suspicion to believe that McCoy was in the vehicle. Am I correct about that? Right. Was there reasonable suspicion to believe... Yes. So, as I understand it, you... Everything... You've conceded that if we decide there was not reasonable suspicion to believe McCoy was in the vehicle, then you concede that the evidence has to be suppressed. Of course. Okay. Okay. I just wanted to make sure of that. Yeah, and again, Judge, we conceded that below, that under the circumstances... Yeah, that's what I thought. I just wanted to confirm it. Yeah. I'm sorry. Let me clarify some follow-up on that. You're saying the evidence has to be suppressed. Is there not further Fourth Amendment inquiry that needs to take place? I mean, let's assume, just for the moment, for the sake of argument, that we were to find that this felony stop was unlawful. Are there not other Fourth Amendment issues that need to be sorted out? I mean, for appellant's brief, she seemed to acknowledge that there might be other things that needed to be addressed. Are you saying it's game over if we find that the felony stop was unlawful? Well, we know that them pulling Mr. Williams from the car and the basis for that was based upon the reasonable suspicion. Everything that flowed from that event, Officer Palumbo going to the car to clear it, and then Officer Quall smelling it on Mr. Williams are the basis for the search. So, Judge, quite candidly, I believe under the circumstances that we could not prevail if this court did find under the circumstances that the felony car stop was, in fact, unreasonable under the Fourth Amendment. Well, no, I appreciate your candor, and I wasn't challenging that. I just wanted to get clear of what your view was. Okay. Thank you. Unless there are other questions about the actual felony car stop itself, I do want to again reiterate that the court really must look at and not really divorce itself from what the officers knew and why they were there to find Mr. McCoy and his association with Miss Delgado. So to the degree that there is some concern that the only issue is whether or not Mr. Williams and Mr. McCoy had ever really ever been seen together, it certainly weighed heavily, at least on the decision-making process that the officers had, that they were at a location that they believe Mr. McCoy was at based upon Miss Delgado, and then all of a sudden see someone that they also know is associated. So those issues, I think, taken in total, have to be weighed very, very heavily in favor of the officers and their understanding of what they knew at the time. Is it in fact the case that they didn't see Mr. Williams with Miss Delgado, right? Yeah, and there's really no understanding or belief that Miss Delgado has any association with Mr. Williams. We just know Miss Delgado was Mr. McCoy's purported girlfriend, and that's why they were there staking out that apartment complex. But you have to put yourself, and again, and this court has made it very clear not to necessarily second-guess officers, but I think to some degree putting yourselves in the position of the officers being there and all of a sudden seeing a vehicle, knowing that it's associated with the McCoys, thinking, wow, this can't be coincidental. We ought to at least follow up with this and see what happens, and then the question is, was it unreasonable for them to then engage in the high-risk stop procedures? Turning to that issue, Judge Hartz, I do want to make, and Judge Holmes, to go back to one issue that you had about the car stop. Again, Officers Nelson and Officer Qualls were the first two that were there. You'll see, I think it's in Officer Nelson's testimony, this was a heavily trafficked area, so there certainly were back officers that were going to come in to assist with traffic and things like that. I don't want it to sound as if this was a SWAT team swarming on a car. That really isn't the circumstance. You have the two officers who are told, and again, remember, this just, for lack of a better word, just sort of falls out of the sky. Yeah, I saw at least one of the videos, and I saw the two officers. I just wondered whether there was other video evidence that I missed in the one scene. In the one scene, I did see two officers addressing, and it was on a heavily trafficked street at night. All those things sort of play out in some of the cases, but there were people outside of the view of the vision that I saw in that film that were there at the scene at the time of the stop, right? Fair statement, Judge. Okay. And again, if we get past the issue of whether or not the high-risk stop was reasonable under the circumstances, I think it's very clear that our position is, one, that once Officer Quals smelled marijuana on Mr. Williams, that was enough probable cause for them to go ahead and engage in the search, and irrespective of what Officer Palumbo saw. But, Judge Hartz, I do want to reiterate what you said. There's clearly nothing in the record to suggest that Judge Teeter's analysis was clearly erroneous about what Officer Palumbo did under the circumstances. He indicated that his camera, where it's positioned on his body, did not necessarily give exactly what his eyes were seeing, but what the overall scene was at the time. And finally, in the last couple of seconds, we do believe that the issue on the search of the safe is really academic because, under the circumstances, the officers had the right to search the safe and were simply asking for consent not to damage her property. And unless the court has any other questions, we would ask that the court inform the lower court's decision and find that that decision should be upheld. Any questions? Thank you, Counsel. Ms. Reynolds, I'll give you 30 seconds. Thank you, Your Honor. First, very briefly, what the officers knew at the time the court is asking questions about because it seems quite critical. Officer Salmon testified, as did the other officers, that the only association wasn't between the people, but between an address and a vehicle. And so I want to make sure that that is clear. There's no association between the two of them. The second issue is the plain view and plain smell. The search was already in progress whenever Officer Qualls communicated the smell of marijuana. And this is reflected in the videos that the court has. Thank you, Counsel. Your time has expired. Thank you, Your Honors. Thank you very much, Counsel. Case is submitted.